**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | : | **MDL NO. 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| ***Providence St. Joseph Health, et al. v. Actavis Holdco U.S. Inc. et al.*** | : | **23-CV-03636** |

**SPECIAL MASTER LAWRENCE F. STENGEL'S**
**REPORT AND RECOMMENDATION TO THE COURT RESOLVING DEFENDANTS' SECOND MOTION TO COMPEL DISCOVERY FROM HOSPITALS**

Before me is the Defendants' second motion to compel the Plaintiff Hospitals to produce various materials related to the drugs at issue in the above-captioned action. *See* MDL Doc. 4558. The Plaintiff Hospitals filed their original opposition on June 23, 2026. *See* MDL Doc. 4664. The Court referred the Defendants' motion to me on June 24, 2026. *See* MDL Doc. No. 4665. The Hospitals then filed a corrected opposition on June 29, 2026. *See* MDL Doc. No. 4683. The Defendants submitted a letter to me in support of their motion on July 1, 2026.[1] Oral

[1] In an email to me dated July 8, 2026, the Plaintiff Hospitals dispute the timeliness of the Defendant's July 1, 2026 letter. The Hospitals argued that PTO 334, ¶ 2 provides that a reply "will not be considered unless filed no later than the matter's referral to a Special Master or seven days after the response's filing, whichever is earlier." The District Court referred this motion to me on July 1, 2026; therefore, according to the Plaintiffs, "any reply was due that day." The Defendants countered that their July 1, 2026 letter was not a reply, but was instead "additional information" under PTO 334 ¶ 3(a), due seven days after the referral order. I find that this situation presented an unusual circumstance where the District Court's referral order was issued nearly immediately after the Hospitals submitted their original opposition, giving the Defendants practically no time to submit a reply. Since this motion to compel unfortunately stems from a breakdown in the meet-and-confer process, and because I elected not to hold oral argument, I find that considering the Defendants' July 1, 2026 is appropriate and helpful to me.

argument occurred on August 19, 2026. Having considered the parties' submissions and their arguments, the matter is ripe for adjudication.

## I. BACKGROUND AND THE DOCUMENT REQUESTS AT ISSUE

Defendants' second motion to compel was filed while their first motion to compel was pending. As I observed in my Report and Recommendation on the first motion to compel, the instant dispute showcases the critical importance of a functional meet-and-confer process in civil litigation. The instant motion presents an example of the discovery delays and dysfunction that can ensue when parties cannot constructively meet and confer. While the first motion to compel was based on a relatively small number of requests for production, the second motion asks me to recommend a resolution to the District Court on over 60 document requests.

Asking the Court to resolve several dozen document requests imposes a burden on judicial resources and reflects a failure to honor the good faith cooperation that Federal Rule of Civil Procedure 37(a) and our Local Rule 26.1 require. Now the parties find themselves in the unfortunate position of facing a tight discovery deadline, after many months were lost while motions to compel were litigated.

## II. THE RELEVANT CASE LAW

### A. The Scope of Discovery Under Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26(b)(1) provides that a party may obtain discovery regarding any nonprivileged material that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(1). It is

axiomatic that trial courts have broad discretion in fashioning remedies related to discovery. *See Gutierrez-Rodriguez v. Cartagena*, 822 F.2d 553, 576 (1st Cir. 1989) (citing *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976)).

Similarly, it is "well recognized that the federal rules allow for broad and liberal discovery." *Pacini v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999) (citing *In re Madden,* 151 F.3d 125, 128 (3d Cir.1998) ("Pretrial discovery is ... 'accorded a broad and liberal treatment.'") (citing *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)). Relevance is a broader inquiry at the discovery stage than at the trial stage. *See Nestle Food Corp. v. Aetna Cos. & Surety Co.*, 135 F.R.D. 101, 103 (D.N.J. 1990). For discovery purposes, a matter is relevant if it relates to or could reasonably relate to "any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 (1978). Moreover, antitrust cases generally call for broad discovery. *See In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 228, 230 (E.D.Pa. 2014). When a party seeks to compel discovery over another party's objection, the party moving to compel bears the burden of showing the relevance of the requested information. *See Brown v. Friel*, 2017 WL 11804919, at *1 n.5 (E.D. Pa. Feb. 9, 2017) (Sanchez, J.)

**B. Case Law Related to Antitrust**

As noted in my Report and Recommendation on the Defendants' first motion to compel, the instant dispute is governed by state law. The Plaintiffs previously represented that the relevant state laws included those in which the various Plaintiff Hospitals operate. Given the number of individual Plaintiff Hospitals, however, dozens of state laws (both antitrust and consumer protection/unfair competition) are implicated. In my Report and Recommendation on the Defendants' first motion to compel, I recommended to the District Court that the lack of sufficient briefing on each potentially applicable state law counseled that the most prudent course

was accepting the Defendants' argument that pass-through-related information was relevant, at least at the Rule 26 stage.

### C. Building a "Discovery Fence"

Given the volume and scope of discovery requests at issue, it is necessary to evaluate how to approach the parties' dispute in a manner that is fair to the parties, while recognizing the challenges inherent in addressing disagreements on over 60 document requests. I am aided in this endeavor by an approach previously used by the Honorable Judge Michael M. Baylson of the United States District Court for the Eastern District of Pennsylvania. When presented with large/thorny discovery disputes in an antitrust matter, he constructed "a discovery fence" to set the boundaries for appropriate discovery. *See In re Domestic Drywall Antitrust Litig*., 2016 WL 4414640, at * 2 (E.D. Pa. Aug. 18, 2016). As Judge Baylson observed, "a discovery fence should, after considering the parties' arguments, generally enumerate those topics that are within the discovery fence that should encompass document production [.]" *Id.* A discovery fence is not immutable and "may be expanded or limited because of developments in the case or because of demonstration by the parties[.]" *Id.*

## III. THE PARTIES' POSITIONS AND MY RELATED RECOMMENDATIONS

Although the parties have agreed on little during their discovery disputes, here they have generally agreed on topical areas into which clusters of the document requests can be grouped. This Report and Recommendation will follow the parties' lead and consider the disputed requests based on their underlying general topical areas, as the sheer number of document requests at issue (well over sixty) makes a request-by-request analysis impracticable.

The metes and bounds of the discovery fence, as it relates to specific requests are discussed below. However, as a general point, I find that information/materials that relate to the

amount of the various drugs at issue that the Plaintiffs purchased and what they actually paid for those drugs is information inside the discovery fence and, thus, should be produced by the Hospitals. The fundamental allegation in this litigation is that the Plaintiffs paid too much for the drugs at issue, due to the Defendants' alleged anticompetitive conduct. Accordingly, what the Plaintiffs bought, how much of it they bought, and what they paid for it are points well within the discovery fence. Conversely, the Defendants have a valid interest in challenging the validity of the Plaintiffs' claims regarding injury, causation, and damages. Information/materials related to factors other than the Defendants' alleged anticompetitive conduct that could have affected what the Hospitals bought and what they paid is also information inside the discovery fence. The Defendants are also entitled to information related to chargebacks, rebates, etc., that affect what the Plaintiffs actually paid for the drugs at issue.

Using these general "fencing" principles as a guide, my specific recommendations are set forth below in the subsection devoted to each subgroup of Requests for Production ("RFPs"). Due to the volume of RFPs at issue, this format seems more manageable than separately setting out recommendations in a different section.

**A. Distribution Purchase Agreements (RFPs 2, 3, 6, and 7)**

These RFPs seek documents related to Hospitals' agreements with any Defendant, other manufacturer, or Group Purchasing Organization ("GPO") regarding the drugs at issue. Defendants argue that the agreements sought by these requests provide information on what drugs the Plaintiffs purchased, who supplied them, and under what purchase terms. Def. Mem. at 6-7. The Hospitals agreed to produce distribution, wholesaler, and vendor purchase agreements regarding the drugs at issue in the litigation. However, the Hospitals argue that informal pricing email-communications, draft agreements, and negotiation-related correspondence are not

relevant as they reflect "a price no one paid." Opp. at 6. The Defendants believe that the Hospitals' proposed limitation wrongfully excludes materials that show terms and conditions and changes to purchase orders and Group Purchasing Organization (GPO) agreements. Def. Mem. at 7.

*Recommendation*: What drugs the Plaintiffs purchased, who supplied them, and under what purchase terms is clearly relevant. The Hospital should produce the materials that they volunteered to produce, which appear to be the final, executed agreements. Internal communications leading up to the ultimate finalization of the various agreements do seem to me to be an overly broad request, as what the Hospitals actually ordered/paid would be a function of final agreements. Indeed, I have previously denied overly broad, unclearly relevant requests for custodial emails on PBM issues. With that said, however, communications with GPOs that relate to drug-purchases and that may show that the Hospitals were motivated to purchase drugs for reasons other than price (e.g., a willingness to pay a higher price for a product due to some other factor, such as availability or convenience) would seem to be relevant to the issue of whether the Defendants' alleged conduct caused injury and/or to what extent. Thus, I recommend that the Plaintiffs identify one key custodian per Hospital and that the Defendants identify ten global search terms (i.e., terms that will be used across all Plaintiffs) that would be expected to identify such communications without engaging in an unfettered expedition through each Hospital's emails across numerous custodians. I recommend that the parties complete that identification process within *five* days of the date that the District Court issues any order adopting this Report and Recommendation. Once the custodians and search terms have been identified, the Hospitals are to run the searches within five days and produce materials to Defendants no later than three days after the searches are complete.

**B. Formal Requests for Proposals and Responses (RFPs 8, 9, 10, and 11)**

Defendants argue that the requests for proposal and related responses show the number and identity of suppliers that competed for the Plaintiffs' business, the pricing/sales terms offered to the Plaintiffs, and the alternative suppliers and prices available to the Hospitals. Def. Mem. at 8-9, The Defendants observe that "if a Hospital has the opportunity to purchase [a drug] from a different supplier at a lower price but chose to continue purchasing from a supplier at a higher price for convenience or other preference, that would be significant to the Hospitals' damages calculation and to whether the Hospital suffered an injury or damages by a purported conspiracy." Def. Mem. at 8.

The Hospitals agreed to produce formal requests for proposal and responses (documents through which Hospitals selected suppliers/negotiated pricing). However, the custodial request for informal, email-based pricing communications is burdensome. The Hospitals also point out that they purchase drugs through Group Purchasing Organizations (GPOs), which is not how other plaintiffs in the MDL have operated, and which sets the Hospitals apart in terms of relevant discovery on this issue. Opp. at 6-7.

*Recommendation*: In principle, I find the general topic of the Defendants' request to be relevant and fall within the scope of the discovery fence. I am sympathetic, however, to the Hospitals' argument that they purchase drugs through GPOs, which makes their commercial conduct different from various other MDL plaintiffs that have preceded them. I also continue to be reluctant to recommend broad production of an untold number of email custodians. However, I agree with the Defendants that they should be able to discover whether any of the Hospitals could have purchased drugs at issue at a lower price from a different source but ultimately decided to go with a higher-priced option for reasons not related to the Defendants' alleged anticompetitive

conduct. Accordingly, I recommend that the parties engage in the same custodian/search-term process that I set forth above in Section A.

### C. Purchase Price, Location-Based Information, and Corporate Governance Documents (RFPs 5, 15, 58, 59, 60, 79, and 87)

Regarding RFPs Nos. 5, 15, and 79 (characterized by Defendants as documents relating to the prices paid, charged, and considered by Hospitals for the drugs at issue), the Defendants argue that information on prices paid by, charged to, and considered by Hospitals is the "heart" of antitrust litigation. *See* Def. Mem. at 9. As to RFPs 58, 59, and 60, Defendants argue that they are entitled to information concerning where Hospitals purchased, sold, and dispensed the drugs at issue to assess which states' laws apply to which purchases, sales, and dispensing and to present an adequate defense to each Hospital's claims under the applicable state law. *See* Def. Mem. at 13. For RFP 87, the Defendants argue that purchasing policies and procedures are relevant to the Defendants' understanding of the factors Hospitals used to purchase the drugs at issue to understand whether any Hospital ignored its own policies and procedures. *See* Def. Mem. at 15.

The Hospitals respond that they are working on deanonymizing the distributor data, which has purchase-price information. Opp. at 7. The Hospitals also agreed to produce purchasing policy documents (to the extent that they exist). However, the Hospitals balk at producing documents "concerning" prices charges or proposed and any actual or potential price increases. Opp. at 7-8.

*Recommendation*: Purchase information falls squarely within the area defined by the discovery fence. In my Report and Recommendation on the Defendants' first motion to compel, I recommended that the Hospitals produce their purchase and sale data. I also observed that, under Federal Rule of Civil Procedure 45, the Hospitals may have separate obligations to produce the third-party distributor data that they obtained through their subpoenas. Further, during the multiple mediated sessions with the parties on the first motion to compel, the Hospitals represented that the

controlling state law would be determined by the state in which the Hospital operates. Thus, I am hoping that the combined forces of the Hospitals' purchase- and sales-data production, coupled with/supplemented by the third-party distributor data, will give the Defendants the location data that they seek. The request for Corporate Governance materials seems to stray a bit further afield, particularly in a commercial reality where Hospitals relied on GPOs to negotiate and purchase the drugs at issue. Because the relevance of Corporate Governance materials appears to be thin, I recommend that the District Court deny RFPs that relate to such materials.

**D. Organizational Charts (RFPs 61, 62, 63, and 64)**

Defendants argue that they need the Plaintiffs' organizational charts to identify proper document custodians and deponents. The Hospitals agreed to produce organizational charts identifying employees responsible for pharmaceutical purchasing decisions and supplier communications. Opp. at 9. However, Hospitals say that employees who determined prices subsequently charged by the Hospitals, employees who communicated with PBMs regarding pricing, and employees who communicated with third-party payors regarding pricing are not individuals with relevant information. Opp. at 10.

*Recommendation*: At this stage in discovery, I find that the Defendants' broad request for organizational charts is relevant. Certainly, at the very least, while future depositions may ultimately result in additional disputes, the organization charts would aid the Defendants in running searches through the various production materials and interpreting the results. I recommend that the District Court grant the Defendants' requests for organizational charts.

**E. Documents Supporting the Allegations in the Complaint; Assignment Documents; Documents Supporting Damages Calculations (RFPs 77, 78, 80, 84, 85, 88, 89, 103)**

Defendants observe that documents used to prepare/support the Complaint allegations are typically a non-controversial discovery request. *See* Def. Mem. at 14. Regarding Request 89, the Defendants are seeking documents concerning the bases for and amounts of Hospitals' damages claims (which is a topic thematically related to the Complaint allegations). Def. Mem. at 15. The Hospitals have agreed to produce non-public documents relied upon to draft the Complaint. Opp. at 9. They have also agreed to produce documents related to the assignment of claims. The Hospitals oppose the Defendants' damages-related request, saying that damages will be established through expert analysis of purchase data.

*Recommendation*: I agree with the Defendants that requests for materials cited in civil complaints are standard fare in civil discovery. Within *seven* days of any order approving this Report and Recommendation, the Hospitals should produce the materials that they relied on in preparing their complaint. Both public and non-public materials should be produced. I also find that damages-related information is relevant and should be produced, if the Hospitals have it available. If the damages calculations would not be known until experts perform their analyses, then the Hospitals cannot produce information that they do not have. However, if the Hospitals have any such information, and it is not duplicative of other requests (e.g., other RFPs related to purchase or sales data), then the Hospitals should produce such materials.

**F. Internal Procurement Analyses (RFPs 16, 17, 19, 20, 21, 22, 23)**

Defendants seek documents concerning the Hospitals' consideration, analysis, and evaluation of pricing (including Wholesale Acquisition Cost and Maximum Allowable Cost) for the drugs at issue. Defendants argue that, in a price-fixing conspiracy case, information on pricing, price increases, and a plaintiff's "reactions to the changes in prices are relevant to discovery" and

"go to the heart of the case." Def. Mem. at 10, citing *In re Drywall*. The Hospitals counter that internal evaluations of drug pricing, WAC/MAC analyses, responses to price changes, and procurement decision-making communications are not relevant, because Hospitals are indirect purchasers who do not negotiate with Defendants. Opp. 10. Further, a Hospital's internal decision on which supplier to use or how to respond to a price increase does not show Defendants' conspiracy caused no injury. The Hospitals also raise a burden argument, asserting that they are major integrated health systems whose procurement functions span many facilities and decades of personnel turnover. Searching that infrastructure would impose an extraordinary custodial burden. Opp. at 10.

*Recommendation*: I am not satisfied that the Defendants adequately articulated the relevance of the requests related to internal procurement analyses, particularly in light of the Hospitals' explanation that internal analyses would generally be limited to tracking whether a Hospital was purchasing sufficient quantities of drugs to meet a GPO's tier-requirements. While it may be possible that some documents related to off-contract, non-GPO purchases may exist, I am not convinced that the volume of such materials (if they could be identified) is sufficient to outweigh the burden that the Hospitals would face in producing the materials. Accordingly, I recommend that these requests be denied.

**G. Communications With Manufacturers (RFPs 12, 13, 14, 97, and 98)**

Defendants seek communications between Hospitals and the Defendants regarding the purchase, acquisition, sale, supply, reimbursement, discount, rebate, or chargeback for the drugs at issue. Def. Mem. at 10-11. Defendants rely on logic from *In re Drywall* to the effect that "[o]bviously, any communications between Defendants, [Plaintiffs], or [Plaintiffs] dealers on the topic of price increases go to the heart of the case." Def. Mem. at 11. The Hospitals oppose the

requests on the grounds that they are indirect purchasers who buy through wholesalers and rely on GPOs to negotiate terms. Opp. at 11. Thus, Hospitals rarely communicate with manufacturer-defendants. Further, any such communications would be in the Defendants' own materials. The Hospitals also noted that, across over 30 million documents produced by Defendants in the MDL, Hospitals have found only three Hospital domain names in a few dozen emails with Defendants. Given that the communications barely appear to exist (based on the Defendants' productions), the Hospitals maintain that the Defendants' request is unduly burdensome. Opp. 11-12.

*Recommendation*: Having relied on Judge Baylson's reasoning in *In re Drywall*, I respect the holdings of the *Drywall* court; however, the *Drywall* court was not adjudicating a matter that involved hospitals and the unique commercial processes and procedures that they use. Again, I am sympathetic to the Hospitals' argument that they rely on GPOs to purchase pharmaceutical products. In addition, it appears that searches of the available production sets support the Hospitals' argument that hospital-manufacturer communications would not be expected to exist (or to exist in substantial amounts), because of the role that GPOs play. Accordingly, I recommend that the Defendants' motion to compel the RFPs related to communications with manufacturers be denied.

### H. Health Plan and PBM Documents (RFPs 24 through 33)

Defendants seek documents concerning Hospitals' analysis, evaluation, or consideration of how conduct by health plans and PBMs affected Hospitals' price and supply of generic drugs and the "profitability of sales by Hospitals of generic drugs." Def. Mem. at 11. Defendants argue that such materials are relevant to whether any alleged price increases were caused by Defendants' conduct or by other participants in the distribution chain. Further, evidence that Hospitals determined that health plan consolidation and market power or PBM consolidation and activity

affected pricing and supply of the drugs at issue or contributed to price increases is relevant to causation and damages. *Id.*

The Hospitals counter that the majority of Hospitals' claims are for drugs purchased for inpatient administration, which would then be reimbursed at Diagnosis-Related Group or fixed-fee rates with no PBM involvement. Opp. at 12. They also claim that the materials relate to a pass-on defense (Opp. at 13); however, in the Report and Recommendation on the first motion to compel, I recommended that downstream data be produced, as it was premature at this juncture – and in the absence of sufficient state-law-specific briefing – to assume that all downstream data were irrelevant under the broad aegis of Rule 26.

*Recommendation*: I find that the Defendants have adequately explained the relevance of reimbursement data for any outpatient prescriptions for any Plaintiff Hospital. I am therefore recommending that the Hospitals produce such Health Plan/PBM data for any outpatient prescriptions. Such data should include final information on reimbursements and any final analyses that a Hospital may have performed regarding such outpatient-prescription reimbursements. To the extent that the Defendants' requests seek custodial documents such as drafts, internal communications, and emails, I recommend that the requests be denied. During argument, the Hospitals noted that they have filed an objection with the District Court regarding my Report and Recommendation on Defendants' first motion to compel, to the extent that the Report recommended producing inpatient as well as outpatient data. If the District Court sustains the objection, then this Report and Recommendation should track the Court's ruling. Conversely, if the objection is overruled, then any Health Plan/PBM reimbursement data for inpatient prescriptions should be produced as well, to the extent that any may exist.

### I. Trade Association Documents (RFPs 91 through 96, 99 through 101)

Defendants seek documents concerning trade association meetings and events attended by Hospitals' employees who had "substantive involvement" in or "substantive communications" related to Hospitals' purchasing and selling of the drugs at issue (all RFPs other than No. 94); and Hospitals' employees' communications at trade association meeting and events with Defendants (RFP 94). Def. Mem. at 12. Defendants argue that, if the Hospitals' employees attended the same trade-association events as the Defendants, then they are entitled to discover what those employees saw or learned at the events related to the Hospitals' claims, including whether the Hospitals engaged in legitimate business with their suppliers at these events. Def. Mem. at 13. The Hospitals oppose the request because the Defendants withdrew equivalent requests against the IRP class during an informal discovery resolution before Special Master Merenstein on or about July 31, 2019. The Hospitals also observe that their conduct at trade association meetings – good or bad – has no bearing on the nature of the Defendants' conduct at such meetings. Opp. at 14. In addition, the Hospitals again argue that they are too big/widespread to look for these materials. *Id.*

*Recommendation*: Trade-association-related materials fall outside the parameters of the discovery fence. I recommend that the Defendants' requests for these materials be denied.

### J. Drug Supply, Availability, and Market Documents (RFPs 71 through 76, 90)

Defendants seek multiple categories of documents related to the supply and availability of the drugs at issue to the Hospitals. Def. Mem. at 12. These categories include:

- Supply, Production, Availability, Shortage, and Demand for the drugs at issue (RFP 71);
- Supply and Availability of Active Pharmaceutical Ingredients (RFP 72);
- Market Entry and Exit of Defendants and Other Suppliers (RFPs 73, 74)

- Factors Considered by Hospitals in Purchasing Decisions of drugs at issue (RFP 75);
- Reputation of Defendants and Suppliers of drugs at issue (RFP 76);
- Market Share of Manufacturers and Suppliers (RFP 90).

Defendants argue that information regarding Hospitals' understanding of the supply and availability of the drugs at issue, the reputations of the suppliers of the drugs at issue, Hospitals' understanding of the markets for the drugs at issue, and Hospitals' understanding of what suppliers were entering or exiting the market for a drug at issue bear on why Hospitals may have purchased the drugs at issue from, or paid a higher price to, particular suppliers. Def. Me. At 12. Understanding what Hospitals understood and believed is necessary to evaluate Hospitals' claims and whether Hospitals suffered damages or antitrust injuries. The Hospitals counter that Defendants withdrew equivalent requests against the IRP class during an informal discovery resolution before Special Master Merenstein on or about July 31, 2019.[2] The Hospitals further argue that their subjective beliefs about the market do not inform antitrust injury, causation, or damages. Opp. at 15.

*Recommendation*: I am persuaded that the Hospitals' subjective beliefs about the market do not inform an analysis of antitrust injury, causation, or damages. I also find it compelling that similar requests were not pursued before Special Master Merenstein, following a series of targeted search-term analyses that yielded minimal results. At this late time in the discovery process, I must be guided by the prior course of conduct before Special Master Merenstein, and, unfortunately, the discovery window is rapidly closing. There is simply insufficient time to

---

[2] Hospitals' reliance on issues related to the discovery dispute between Walgreens and the Sandoz (Opp. at 14) is misplaced, as that dispute had unique facts.

attempt a similar search-term beta test and further negotiation (where we do not even have search terms identified). Accordingly, I recommend that these requests be denied.

## IV. CONCLUSION

As noted above, the current parameters of the discovery fence are not immutable, and they could change as the discovery process proceeds and information is reviewed and analyzed. However, I would hope that the parties would spare the Court from future disputes where the meet-and-confer process devolved to the point where the Court is presented with a broad set of document requests and a general plea to impose order. Narrowly tailored discovery disputes that reflect good faith efforts to reach a reasonable resolution allow for well-developed and focused arguments. Of course, the doors of the Court remain open to assist the parties, but it is always appreciated when the parties first try to assist themselves.

Therefore, for the reasons outlined above, I recommend that the Court grant in part and deny in part the Defendants' second motion to compel production from the Hospital DAPs, as set forth in the attached proposed order.[3]

Respectfully submitted,

Date: August 27, 2026

*/s/ Lawrence F. Stengel*
Hon. Lawrence F. Stengel (Ret.)
*Court Appointed Special Master*
SAXTON & STUMP, LLC
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
(717) 556-1080
lfs@saxtonstump.com

[3] As I had begun to prepare my Report and Recommendation on the instant dispute, UPMC Health Plan, Inc. ("UPMC-HP") again surfaced to object to its inclusion in this proceeding. I also note that UPMC-HP filed objections to the prior Report and Recommendation on the Defendants' first motion to compel production from the Hospital DAPs and the District Court's adoption thereof. At argument, counsel for UPMC-HP asked for an opportunity to discuss with the Defendants whether and how UPMC-HP's status as an end payer rather than a Hospital may affect the applicability of the Defendants' RFPs. I recommended to the Defendants and UPMC-HP that they make a good faith effort to meet and confer on this issue.